UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**TRISTAN HAMILTON,**

      **Petitioner,**

**v.**                                 **Case No. 8:21-cv-1910-MSS-SPF**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

      **Respondent.**

_____/

# O R D E R

Hamilton petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for armed trespass and aggravated battery, for which he is serving a sentence of thirty years in prison. (Doc. 10 at 1) After reviewing the amended petition (Doc. 10), the response (Doc. 14), the reply (Doc. 15), and the relevant state court record, the Court **DENIES** the amended petition.

## PROCEDURAL HISTORY

A jury found Hamilton guilty of armed trespass, a lesser offense of armed burglary, and two counts of aggravated battery, and not guilty of two counts of robbery with a firearm. (Doc. 14-2 at 166–70) For the armed trespass and aggravated battery convictions, the jury determined that Hamilton possessed a firearm during the commission of the offenses. (Doc. 14-2 at 166–70) The trial court sentenced Hamilton to ten years in prison for the armed trespass conviction and a concurrent thirty years in prison for the aggravated battery convictions. (Doc. 14-2 at 173–75)

1

Hamilton appealed, and the state appellate court affirmed. (Doc. 14-2 at 1729) Hamilton filed a petition alleging ineffective assistance of appellate counsel (Doc. 14-2 at 1733–39), and the state appellate court denied relief. (Doc. 14-2 at 1742) Hamilton filed a motion for post-conviction relief (Doc. 14-3 at 4–32), the post-conviction court denied relief without an evidentiary hearing (Doc. 14-3 at 33–44), and the state appellate court affirmed. (Doc. 14-3 at 310) Hamilton's federal petition follows.

## FACTS

On September 19, 2012, three males, who possessed firearms and covered their faces, entered a home on Union Street in Clearwater, Florida, and stole marijuana, a Mossberg twelve-gauge shotgun, ammunition, some money, and other items. (Doc. 14-2 at 677–78, 695, 740) The three males forced their way into the home when the residents and their guests returned to the home. (Doc. 14-2 at 772) An armed male hit a male resident and a male guest over the head with a firearm after demanding that they provide the combination of a safe. (Doc. 14-2 at 671, 681, 742–43, 746, 755) The armed male restrained the male resident's and the male guest's hands with plastic ties, pointed a gun in their faces, and threw a sheet over them. (Doc. 14-2 at 671, 697–98, 743–45, 749, 751) Another armed male pointed a gun at a resident's girlfriend after demanding that she call her boyfriend for the combination of the safe. (Doc. 14-2 at 778–79) The armed male forced the resident's girlfriend and two other females to undress and moved them into a bathroom. (Doc. 14-2 at 749, 754, 781) During the armed trespass, a three-year-old boy, who was the son of one of the females, sat on a couch. (Doc. 14-2 at 745–46, 754)

The residents and the guests could not identify the armed males (Doc. 14-2 at 707, 739–40, 765, 785), but a surveillance camera took pictures of the armed males. (Doc. 14-2 at

673) Photographs taken by the surveillance camera depicted several tattoos on the arms of the perpetrators. (Doc. 14-2 at 811, 840–42) On the arms of one perpetrator appeared the letters "A-R-L-A" and "M-A-D-E." (Doc. 14-2 at 928) On the arms of another perpetrator appeared the letters "B-A-B-Y," "G-A-N-G-S-T-A," and "A-N-G." (Doc. 14-2 at 928)

A detective used a database to match the tattoos of the letters "A-R-L-A" and "M-A-D-E" to Hamilton and to match the tattoos of the letters "B-A-B-Y," "G-A-N-G-S-T-A," and "A-N-G" to Andre Miles, Hamilton's co-defendant. (Doc. 14-2 at 929–32) Before trial, a forensic specialist photographed the tattoos on Hamilton's and Miles's arms with natural, ultraviolet, and infrared light. (Doc. 14-2 at 1190–97) A multimedia technician adjusted the contrast, sharpness, size, and orientation of several photographs of Hamilton's tattoos, including booking photographs taken before the crimes occurred, photographs taken by the surveillance camera during the crimes, and photographs taken by the forensic specialist after Hamilton's arrest. (Doc. 14-2 at 1271–74)

The tattoos on Hamilton's arms in the booking photographs taken before the crimes were the same size and in the same location as the tattoos captured by the surveillance camera. (Doc. 14-2 at 258–71) In the photographs taken after Hamilton's arrest, an additional tattoo of the letters "S-E-L-F" appeared above the tattoo of the letters "M-A-D-E" and an additional tattoo of a dollar sign with stars appeared next to the tattoo of the letters "M-A-D-E." (Doc. 14-2 at 262, 264) Also, the letters in the word "M-A-D-E" were filled in and straightened, when compared with the photographs captured by the surveillance camera during the crimes. (Doc. 14-2 at 260–62, 264) However, unique loops around the letters "M" and "D" appeared in both the photographs captured by the surveillance camera during the crimes and photographs taken after Hamilton's arrest. (Doc. 14-2 at 260–62, 264)

3

A forensic photographer testified that infrared light shows welting, or bruising underneath the skin from a recently applied tattoo. (Doc. 14-2 at 1211–13) A dermatologist reviewed the infrared photographs of Hamilton's tattoos taken after his arrest and identified welting where the letters on the tattoo of the word "M-A-D-E" were filled in and straightened and where the stars and the dollar sign appeared. (Doc. 14-2 at 1325–26) The dermatologist explained that welting remains for six to twelve months after a tattoo is applied. (Doc. 14-2 at 1320–21, 1325–26) Police arrested Hamilton on April 17, 2013 (Doc. 14-2 at 1164–65), and the forensic specialist photographed Hamilton's tattoos on May 27, 2014, over a year after Hamilton's arrest. (Doc. 14-2 at 1190–91, 1195–97)[1]

| Booking Photograph<br>Before Crimes<br>(Doc. 14-2 at 259) | Photograph from Surveillance Camera<br>During Crimes<br>(Doc. 14-2 at 261) |
| --- | --- |
|  |  |

---

[1] The multimedia technician placed red circles around the letters "M" and "D" in the photographs of the tattoo of the letters "M-A-D-E." (Doc. 14-2 at 1273–74)

**Forensic Photograph
After Hamilton's Arrest
(Doc. 14-2 at 262)**

**Forensic Infrared Photograph
After Hamilton's Arrest
(Doc. 14-2 at 263)**





Two days after the crimes, a detective recovered a Miami Dolphins hat and shotgun shell casings from a residential area on Pine Brook Drive in Clearwater. (Doc. 14-2 at 824–29) A DNA analyst extracted a partial DNA profile from the Miami Dolphins hat and determined that Hamilton's DNA matched the eleven locations on the partial DNA profile. (Doc. 14-2 at 983–86) The probability that another person would have the same match was one in fourteen billion in the African American population. (Doc. 14-2 at 986) Six days after the crimes, the detective recovered a Mossberg twelve-gauge shotgun from a home on North

Madison Avenue in Clearwater. (Doc. 14-2 at 915–20) The detective testified that young males, including Hamilton's co-defendant, Andre Miles, regularly spent time at the home on North Madison Avenue where the detective recovered the shotgun. (Doc. 14-2 at 1044–49) Also, three days before trial, the detective saw Miles at a home located behind the home on North Madison Avenue where the detective recovered the shotgun. (Doc. 14-2 at 1049–50, 1053–55)

A firearms expert determined that the shotgun shell casings recovered from Pine Brook Drive expelled from the Mossberg twelve-gauge shotgun recovered from North Madison Avenue. (Doc. 14-2 at 1033–35) The resident who lived at the home on Union Street, where the crimes occurred, and who owned the Mossberg shotgun, identified the shotgun recovered from North Madison Avenue as his shotgun. (Doc. 14-2 at 682–86) The shotgun recovered from North Madison Avenue had scratches where the resident had installed a light, superglue where the resident had attached a switch for the light, and an extended stock that the resident had installed. (Doc. 14-2 at 682–86)

A deputy sheriff testified that, during Miles's arrest for a warrant in this case, Miles shifted his car into reverse and collided with another deputy's car. (Doc. 14-2 at 1181) When the deputies removed Miles from his car, Miles physically resisted. (Doc. 14-2 at 1182)

The prosecutor introduced into evidence testimony by Miles at a prior trial.[2] Miles admitted that he spent time at the home on North Madison Avenue where the detective recovered the shotgun, admitted that he spent time at a home behind the home on North Madison Avenue, and admitted that he was close family friends with Hamilton. (Doc. 14-2

---

[2] At the first trial, the trial court declared a mistrial after the jury could not reach a verdict. (Doc. 14-2 at 286–87)

at 1092, 1100) Miles denied that he attempted to flee when police arrested him and claimed that police officers collided into his car, shattered his car window, shot him with a Taser gun, and beat him. (Doc. 14-2 at 1095–96) Miles admitted that he was a convicted felon with nine prior convictions. (Doc. 14-2 at 1100) Miles denied that he appeared in the photographs taken by the surveillance camera, denied that he entered the residence on Union Street where the crimes occurred, and denied that he had seen the Mossberg shotgun before trial. (Doc. 4-2 at 1115)

## STANDARDS OF REVIEW

### AEDPA

Because Hamilton filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of

materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Hamilton asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is

strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

In a decision without a written opinion, the state appellate court affirmed the order denying Hamilton post-conviction relief. (Doc. 14-3 at 310) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 584 U.S. 122, 125–26 (2018). Because the post-conviction court provided reasons for denying Hamilton's claims in a written order (Doc. 14-2 at 33–44), this Court evaluates those reasons under Section 2254(d).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay — or dismiss without prejudice — a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court denies the claim as procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). Also, "a state court's rejection of a federal constitutional claim on procedural grounds will [ ] preclude federal review if the state procedural ruling rests upon

[an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (citing *Coleman*, 501 U.S. at 729–30).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

## ANALYSIS

### Ground One

Hamilton asserts that the trial court violated his federal right to due process by admitting into evidence testimony by the multimedia technician, photographs of tattoos manipulated by the multimedia technician, and evidence and testimony concerning the detective's discovery of the Miami Dolphins hat, the shotgun, and the shotgun shells. (Doc. 10 at 4–5)

The Respondent asserts that the claim is procedurally barred because, in his brief on direct appeal, Hamilton failed to present the federal nature of his claim. (Doc. 14 at 10–11) In his brief, Hamilton raised a claim similar to the claim that he raises in Ground One of his federal petition. (Doc. 14-2 at 1694–1704) However, Hamilton cited only state court opinions, state statutes, and state rules of evidence, summarized the relevant standard under state law for the admission of evidence, argued that the trial court abused its discretion by failing to comply with the standard under state law, and argued that the alleged erroneous admission of evidence was not harmless beyond a reasonable doubt. (Doc. 14-2 at 1694–1704)

Because Hamilton failed to present a federal claim to the state court "'such that the reasonable reader would understand [the] claim's particular legal basis and specific factual foundation,'" he failed to exhaust his remedies in state court. *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (quoting *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). *Lucas v. Sec'y, Dep't Corrs.*, 682 F.3d 1342, 1352 (11th Cir. 2012) ("'[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.'") (quoting *Jimenez v. Fla. Dep't Corrs.*, 481 F.3d 1337, 1342 (11th Cir. 2007)).

In his reply, Hamilton asserts that he fairly presented the federal nature of his claim by citing in his brief on direct appeal *Old Chief v. United States*, 519 U.S. 172 (1997), *Chapman v. California*, 386 U.S. 18 (1967), and Rule 403, Federal Rules of Evidence. The brief cited *Old Chief*, *Chapman*, and Rule 403 as follows (Doc. 14-2 at 1694–96):

> The Florida Rules of Evidence establish when evidence, although relevant, should still be deemed inadmissible. Florida Statute § 90.401 defines relevant evidence as "evidence tending to prove or disprove a material fact." Florida Statute § 90.403, which embodies the rule of evidence relating to prejudicial and confusing evidence, states in part: "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence." Any fact relevant to prove a fact in issue is admissible into evidence unless its admissibility is precluded by some specific rule of exclusion. *See Sexton v. State*, 697 So. 2d 833, 836 (Fla. 1997) (quoting *Williams v. State*, 110 So. 2d 654, 659 (Fla. 1959)). However, "relevancy is not the only test for admissibility. Even after determining that evidence is relevant, a trial court in every case must also consider section 90.403." *Sexton*, 697 So. 2d at 837. The term "unfair prejudice" contemplated in the rule "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Brown v. State*, 719 So. 2d 882, 885 (Fla. 1998) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997) (quoting Fed. R. Evid. 403 advisory committee's note)).

. . .

When a trial court abuses its discretion by admitting inadmissible evidence, the State must show that the erroneously admitted evidence is harmless beyond a reasonable doubt. *See Russ v. State*, 832 So. 2d 901 (Fla. 1st DCA 2002) (citing *State v. DiGuilio*, 491 So. 2d 1129, 1135 (Fla. 1986)). The *DiGuilio* Court noted:

> The harmless error test, as set forth in *Chapman v. California*, 386 U.S. 18 (1967), and progeny, places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction. *See Chapman*, [386 U.S.] at 24. Application of the test requires an examination of the entire record by the appellate court including a close examination of the permissible evidence on which the jury could have legitimately relied, and in addition an even closer examination of the impermissible evidence which might have possibly influenced the jury verdict.

*DiGuilio*, 491 So. 2d at 1135.

*Old Chief*, 519 U.S. at 174, applied federal rules of evidence to determine "whether a district court abuses its discretion if it spurns [a defendant's offer to concede the fact of a prior conviction] and admits the full record of a prior judgment, when the name or nature of the prior offense raises the risk of a verdict tainted by improper considerations, and when the purpose of the evidence is solely to prove the element of prior conviction." *Chapman*, 386 U.S. at 24, established a harmless error standard for a federal constitution error by holding that "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." In *Chapman*, 386 U.S. at 25–26, the Court found that a federal constitutional error occurred when a prosecutor impermissibly commented during closing argument on the defendant's failure to

testify. Neither Old Chief nor Chapman addressed a federal due process claim arising from the erroneous admission of evidence.

*McNair*, 416 F.3d at 1302 (citation omitted), "require[s] that a petitioner presented his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.'" "[D]enial of due process is the failure to observe that fundamental fairness essential to the very concept of justice. [A court] must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Lisenba v. California*, 314 U.S. 219, 236 (1941). "The standard in determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness is whether the evidence is 'material in the sense of a crucial, critical, highly significant factor.'" *Leverett v. Spears*, 877 F.2d 921, 925 (11th Cir. 1989) (citation omitted). Merely citing federal cases with no relation to the facts or assertions being raised does not alert the state court to a federal claim. Hamilton's brief did not recite the legal standard for a federal due process claim and did not apply that federal legal standard to the facts of his case.

Because Hamilton's mere reference to *Old Chief*, *Chapman*, and federal Rule 403, cited in state court opinions applying state rules of evidence, did not sufficiently alert the state court to a federal due process claim, Hamilton failed to exhaust his remedies in state court. *McNair*, 416 F.3d at 1303 (holding that the petitioner's "two references to federal law" in his state appellate brief were "exactly the type of needles in the haystack that [the court of appeals has] previously held are insufficient to satisfy the exhaustion requirement"). *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an

evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

If Hamilton returned to state court to raise a federal claim, the post-conviction court would dismiss the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Consequently, the claim is procedurally defaulted on federal habeas. *Snowden*, 135 F.3d at 736.

Because Hamilton fails to allege facts that demonstrate either cause and prejudice or a miscarriage of justice based on actual innocence, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Even if Hamilton exhausted the claim, the claim is meritless. "[F]ederal courts will not generally review state trial courts' evidentiary determinations." *Taylor v. Sec'y, Fla. Dep't Corrs.*, 760 F.3d 1284, 1295 (11th Cir. 2014). However, relief is granted "if a state trial judge has correctly admitted evidence under state law, but this application of the state rule violated a specific federal constitutional right." *Thigpen v. Thigpen*, 926 F.2d 1003, 1012 (11th Cir. 1991). Also, relief is granted "if a state trial judge erroneously admitted evidence in violation of a state law and the error made the petitioner's trial so fundamentally unfair that the conviction was obtained in violation of the due process clause of the fourteenth amendment." *Thigpen*, 926 F.2d at 1012. As explained above, "[t]he standard in determining whether the admission of prejudicial evidence constitutes a denial of fundamental fairness is whether the evidence is 'material in the sense of a crucial, critical, highly significant factor.'" *Leverett*, 877 F.2d at 925 (citation omitted). *Blackburn v. State of*

15

*Ala.*, 361 U.S. 199, 206 (1960) ("[T]he Fourteenth Amendment forbids 'fundamental unfairness in the use of evidence whether true or false.'") (quoting *Lisenba*, 314 U.S. at 236).

### Photographs and Testimony by Multimedia Technician

Hamilton asserts that the trial court violated his federal right to due process by admitting into evidence photographs of his tattoos manipulated by a multimedia technician and testimony by the multimedia technician explaining the manipulations. (Doc. 10 at 4) Hamilton contends that the manipulated photographs were "highly altered to create a distorted and enhanced image of what [his] tattoos actually looked like" and "were not an accurate depiction of the tattoos [ ] in question." (Doc. 10 at 4) However, the prosecutor introduced into evidence photographs of tattoos captured by a surveillance camera during the crimes and booking photographs of Hamilton's tattoos during arrests that occurred before and after the crimes. (Doc. 14-2 at 222–32, 258, 260, 266, 268) Also, the prosecutor introduced into evidence photographs of Hamilton's tattoos taken by a forensic photographer with natural, ultraviolet, and infrared light. (Doc. 14-2 at 206–21, 262–63, 265, 270) A dermatologist used the infrared photographs to opine that Hamilton significantly altered his tattoos after the crimes. (Doc. 14-2 at 1320–26)

The multimedia technician enlarged and adjusted the sharpness and the contrast of the photographs of the tattoos and placed red circles around portions of the photographs to highlight similarities between the tattoos captured by the surveillance camera during the crimes and Hamilton's tattoos in the booking and forensic photographs. (Doc. 14-2 at 259, 261, 262, 264, 267, 269, 271) The multimedia technician explained to the jury how he enhanced the photographs. (Doc. 14-2 at 1271–74) Because the enhanced photographs and

the testimony by the multimedia technician were available to assist the jury with determining whether the photographs proved Hamilton's identity, and the multimedia technician did not unfairly alter or tamper with the contents of the photographs, the admission of the photographs and the related testimony did not violate Hamilton's federal right to due process. § 90.702, Fla. Stat. (authorizing the admission of testimony by an expert "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue"). *Naylor v. State*, 748 So. 2d 385, 386 (Fla. 3d DCA 2000) ("The admissibility of photographic evidence rests within the sound discretion of the trial court.") (affirming the admission of enlarged autopsy photographs).

### Miami Dolphins Hat, Shotgun, and Shotgun Shells

Hamilton asserts that the trial court violated his federal right to due process by admitting into evidence the Miami Dolphins hat, the shotgun, and the shotgun shells. (Doc. 10 at 4–5) Hamilton contends that the prosecutor did not prove that he was at the scene where police found the hat and the shotgun shells or that the shotgun shells belonged to the victim who lived at the home where the armed trespass occurred. (Doc. 10 at 5)

The evidence proved that, two days after the armed trespass occurred, a detective found the hat next to shotgun shell casings. (Doc. 14-2 at 824–29) Hamilton's DNA matched a partial DNA profile on the hat. (Doc. 14-2 at 983–86) The probability that another person would have the same match was one in fourteen billion in the African American population. (Doc. 14-2 at 986) Six days after the crimes, the detective found the Mossberg twelve-gauge shotgun. (Doc. 14-2 at 915–20) The victim who lived at the home where the armed trespass occurred identified the shotgun found by the detective as the shotgun stolen from his home. (Doc. 14-2 at 682–86) The victim identified unique modifications and scratches on the

shotgun. (Doc. 14-2 at 682–86) A firearms expert determined that the shotgun shells found by the detective next to the hat with Hamilton's DNA expelled from the shotgun identified by the victim as the shotgun stolen from his home. (Doc. 14-2 at 1033–35) In closing, the prosecutor argued that this evidence tended to prove that Hamilton was at least present when a person fired the shotgun several days after the armed trespass and that Hamilton participated in the armed trespass. (Doc. 14-2 at 1435–36, 1450, 1607)

Consequently, the admission of the Miami Dolphins hat, shotgun, and shotgun shells did not violate Hamilton's federal right to due process. *Gartner v. State*, 118 So. 3d 273, 276 (Fla. 5th DCA 2013) ("[F]or the trial court to admit a weapon into evidence, the weapon must be relevant to the alleged crime — evidenced by a sufficient nexus between the crime and weapon. In determining whether a sufficient nexus exists, the trial court can consider testimony identifying distinct similarities between the weapon used in the crime and the weapon proffered at trial.") (citations omitted); *Holloway v. State*, 114 So. 3d 296, 297 (Fla. 4th DCA 2013) ("Generally speaking, evidence that a defendant was in possession of a gun or ammunition is admissible so long as it is sufficiently tied to the crime charged.").

The possibility that Hamilton wore the hat, possessed the shotgun, or was near a person who possessed the shotgun, but did not commit the armed trespass is relevant to the weight of the evidence — not the admissibility. *Gartner*, 118 So. 3d at 276 ("A sufficient nexus does not, however, require testimony that the proffered weapon is definitively the weapon that was used during the crime. Indeed, if it is inconclusive that the proffered weapon is the weapon used during the crime but a sufficient nexus exists, it is the jury's province to determine the credibility and weight of the evidence.") (citations omitted). Consequently,

even if the federal due process claims are exhausted, the state court did not unreasonably deny the claims.

Ground One is **DENIED**.


**Ground Two**

Hamilton asserts that trial counsel deficiently performed by not filing an expanded motion for judgment of acquittal to argue that the prosecutor failed to prove the aggravated battery convictions. (Doc. 10 at 6–7) The post-conviction court denied the claim as follows (Doc. 14-3 at 34–36) (state court record citations omitted):

> Defendant claims that counsel rendered ineffective assistance by failing to make certain arguments in his motion for judgment of acquittal. Specifically, Defendant alleges that counsel failed to argue that the State "did not and could not prove that the defendant did intentionally touch or strike William Koskinen and Emil Katzarski against their will nor did [the State] prove that in committing the alleged battery the Defendant used a deadly weapon." He further argues that "[t]here was no evidence, through testimony or otherwise, to differentiate the acts of either the Defendant or his co-defendant striking any victim," and therefore the State could not have proven that he committed those acts. He contends that the motion would have been successful and resulted in a reduction in charge to simple battery, if not an outright acquittal.
>
> In a claim that counsel rendered ineffective assistance by failing to make a motion, a defendant must demonstrate that the motion would have been successful. *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). To allege a sufficient claim that counsel failed to make a sufficient motion for judgment of acquittal, "a movant should state sufficient facts to show that '[he] may very well have prevailed on a more artfully presented motion for acquittal based upon the evidence he alleges was presented against him at trial.' Where there is no showing that a motion for judgment of acquittal had a likelihood of success, a movant has not presented a facially sufficient claim of ineffectiveness of counsel." *Neal v. State*, 854 So. 2d 666, 670

(Fla. 2d DCA 2003) (quoting *Boykin v. State*, 725 So. 2d 1203, 1203 (Fla. 2d DCA 1999)).

Although counsel made only a perfunctory motion for judgment of acquittal, a more articulate motion would not have succeeded. A judgment of acquittal should be granted if the evidence, viewed in the light most favorable to the state, would not be sufficient to support a finding of guilt beyond a reasonable doubt. *See Pagan v. State*, 830 So. 2d 792, 803 (Fla. 2002).

Here, the State's evidence showed the following. On the night of the crime, William Koskinen and Emil Katzarski went to Mr. Koskinen's home with some friends. When they arrived, three individuals with firearms accosted them. They hit Mr. Koskinen "over the back of the head with a gun" and forced him to try to open a safe in his roommate Kyle's room. When he was unable to do so, they tied him up and ransacked the house. The intruders also bound Mr. Katzarski and struck him over the head with a firearm. The intruders' faces were covered, either by T-shirts or masks, and they all had firearms. Both victims identified their assailants as African American. The assailants took Mr. Koskinen's shotgun, along with some money and marijuana. That shotgun was recovered at another location a few days later, and Mr. Koskinen was able to identify it due to the modifications that he had made to it. As counsel remarked in opening statements, no one was "challenging that a crime was committed here."

The house had a camera monitoring Kyle's room, where the safe was located. Detective Bailey downloaded the images from that camera and passed them on to Detective Beining, who enhanced the images. The State presented those images of the break-in taken from the cameras in Kyle's room to the jury. The State also presented photographs of Defendant while he was in custody. The images from the surveillance camera show that one of the intruders had a tattoo on his right forearm that read "M-A-D-E," the same as Defendant, and a tattoo on his left forearm that read "A-R-L-A," the same as Defendant; photographs taken of Defendant's tattoos both before and after the crime show those tattoos. The State's forensic photography expert opined that the photographs were of sufficient quality to allow an identification. The State's dermatology expert testified that portions of Defendant's "M-A-D-E" tattoo in photos taken well after the crime occurred had been recently added, based on the welting observed in some of the photographs.

20

Police also collected a Miami Dolphins hat and two shotgun shell casings near each other at a different location several days after the crime. The shotgun shell casings were determined to have been fired from Mr. Koskinen's shotgun, and DNA on the hat matched the DNA of Defendant.

That evidence was sufficient to allow a jury to find that Defendant was one of the intruders who attacked the victims with a firearm. The evidence, viewed in the light most favorable to the State, showed that Defendant participated in a break-in armed with a firearm, during which one or more of the assailants used a firearm to strike both victims, which would constitute aggravated battery. Because the victims described the intruders acting in concert, Defendant would be liable as a principal even if the jury could not conclude that he personally struck the victims. *See, e.g.*, *Padron v. State*, 220 So. 3d 500 (Fla. 3d DCA 2017) (sufficient evidence to convict as a principal for crimes against three individuals when the defendant and his co-defendants acted in concert in attacking the victims, even though the defendant only personally attacked one victim).

Because the evidence was sufficient to support a conviction, counsel did not render ineffective assistance by failing to make a motion for judgment of acquittal on the grounds described by Defendant. This claim is denied.

The jury found Hamilton guilty of committing an aggravated battery on both William Koskinen and Emil Katzarski. (Doc. 14-2 at 167, 170) Aggravated battery requires evidence that the defendant "[a]ctually and intentionally touch[ed] or str[uck] another person against the will of the other" while "us[ing] a deadly weapon." §§ 784.03(1)(a)(1) and 784.045(1)(a)(2), Fla. Stat. The information alleged that Hamilton intentionally struck Koskinen and Katzarksi with a firearm. (Doc. 14-2 at 37–38) When reviewing a motion for judgment of acquittal, a trial court views the evidence in the light most favorable to the prosecution. *Reynolds v. State*, 934 So. 2d 1128, 1145 (Fla. 2006) ("In moving for a judgment of acquittal, a defendant 'admits not only the facts stated in the evidence adduced, but also

admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.'") (citation omitted)).

Koskinen testified that an armed male hit him on the back of the head with a firearm. (Doc. 14-2 at 671) Also, Katzarski testified that an armed male hit him on the head with a firearm and that another armed male hit Koskinen with the Mossberg shotgun. (Doc. 14-2 at 742–43, 755) Viewed in the light most favorable to the prosecution, this testimony proved that at least one of the armed males committed an aggravated battery by striking Koskinen and Katzarksi with a firearm against their will.

In each count for aggravated battery, the information cited Section 777.011, Florida Statutes, the statute for principal liability. (Doc. 14-2 at 37–39) "A principal is a person who 'aids, abets, counsels, hires, or otherwise procures' a felony or misdemeanor to be committed." *King v. State*, 286 So. 3d 850, 855 (Fla. 1st DCA 2019) (quoting § 777.011, Fla. Stat.). "[U]nder the principal theory, '[w]hether a defendant knows of a criminal act ahead of time or physically participates in the crime, participation with another in a common criminal scheme renders the defendant guilty of all crimes committed in furtherance of that scheme.'" *Bullard v. State*, 330 So. 3d 593, 596 (Fla. 1st DCA 2021) (quoting *Jackson v. State*, 18 So. 3d 1016, 1027 (Fla. 2009)).

Even if the evidence did not prove that Hamilton personally struck Koskinen and Katzarski with a firearm, the evidence proved that three armed males entered the home together and one of the armed males struck Koskinen and Katzarski with a firearm, while demanding the combination of a safe. (Doc. 14-2 at 671, 742–43, 746–47) Tattoos on Hamilton's arms matched tattoos on one of the perpetrators captured by the surveillance camera during the crimes. (Doc. 14-2 at 258–71) Viewed in the light most favorable to the

prosecution, the evidence proved that Hamilton participated in a common criminal scheme and that one of the perpetrators committed the aggravated battery in furtherance of the scheme. Because at the very least Hamilton was liable as a principal for the aggravated battery on Koskinen and Katzarski, a motion for judgment of acquittal would not have succeeded, and the post-conviction court did not unreasonably deny the claim. *Hunter v. State*, 149 So. 3d 158, 159 (Fla. 4th DCA 2014).

Ground Two is **DENIED**.

**Ground Three**

Hamilton asserts that trial counsel deficiently performed by not objecting to the lack of a jury instruction for battery ("sub-claim A") and to the jury instruction for principal liability ("sub-claim B"). (Doc. 10 at 8)

**Sub-Claim A**

Hamilton asserts that trial counsel deficiently performed by not objecting to the lack of a jury instruction for battery. (Doc. 10 at 8) He contends that the trial court failed to instruct that the jury could find him guilty of battery, a lesser included offense of aggravated battery. (Doc. 10 at 8) The post-conviction court denied the claim as follows (Doc. 14-3 at 37–38) (state court record citations omitted):

> The record conclusively refutes Defendant's claim regarding the instruction on the lesser included offense of battery. The Court instructed the jury that "if you decide the main accusations have not been proven beyond a reasonable doubt, you'll next need to decide if the defendants are guilty of any lesser included crime. . . . The lesser crimes indicated in the definition of aggravated battery is battery." The Court further instructed the jury as to "battery, a lesser as to Count Two. To prove the crime of battery, the State must prove the following element beyond a reasonable doubt: Tristan Hamilton intentionally touched or struck William Koskinen against his will." The Court gave a similar instruction as to Count Five,

the other aggravated battery charge. The Court made no error to which counsel could have objected during its instructions.[1]

> [1] The language Defendant cites in making this claim came when the Court was describing the verdict form — which the jury received — and omitted reading the lesser-included offense of battery for Count Two only, which was however listed on Defendant's verdict form. In light of the Court's other instructions, its description of the verdict form as "identical" to Mr. Miles (for whom that lesser-included offense was read), and the jury's ability to see the verdict form, there is no likelihood that the failure of the Court to read off the verdict form exactly as written affected the jury's verdict.

> Moreover, Defendant's claim fails as a matter of law because he cannot show prejudice for any instructional error related to a lesser-included offense. *See Sanders v. State*, 946 So. 2d 953, 959–60 (Fla. 2006). As the appellate courts have noted, courts cannot accept "the proposition that there is even a substantial possibility that a jury which has found every element of an offense proved beyond a reasonable doubt, would have, given the opportunity, ignored its own findings of fact and the trial court's instructions on the law and found a defendant guilty of only a lesser included offense." *Hill v. State*, 788 So. 2d 315, 319 (Fla. 1st DCA 2001) (quoted with approval in *Sanders*, 946 So. 2d at 959–60). Accordingly, the "possibility of a jury pardon cannot form the basis for a finding of prejudice." *Sanders*, 946 So. 2d at 960. When a jury has found a defendant guilty of a crime, there can be no prejudice from counsel's failure to object to instructional error on a lesser-included offense. *See id.* at 959–60. The claim is denied.

Whether the trial court erroneously instructed the jury on battery is an issue of state law, and a state court's determination of state law receives deference in federal court. *Pinkney*, 876 F.3d at 1295 ("[A]lthough 'the issue of ineffective assistance — even when based on the failure of counsel to raise a state law claim — is one of constitutional dimension,' we 'must defer to the state's construction of its own law' when the validity of the claim that [ ] counsel failed to raise turns on state law.") (citation omitted).

In the information, Count Two charged Hamilton with aggravated battery on Koskinen. (Doc. 14-2 at 37) Count Five charged Hamilton with aggravated battery on Katzarski. (Doc. 14-2 at 38) The trial court instructed the jury to consider battery, as a lesser offense of aggravated battery, as follows:

[Trial court:]    In considering the evidence, you should consider the possibility that although the evidence may not convince you the defendants committed the main crimes in which they are accused, there may be evidence they committed other acts that would constitute a lesser included crime.

Therefore, if you decide the main accusations have not been proven beyond a reasonable doubt, you'll next need to decide if the defendants are guilty of any lesser included crime. . . . The lesser crimes indicated in the definition of aggravated battery is battery.

(Doc. 14-2 at 1622)

[Trial court:]    [B]attery, a lesser as to Count Two. To prove the crime of battery, the State must prove the following element beyond a reasonable doubt: Tristan Hamilton intentionally touched or struck William Koskinen against his will.

(Doc. 14-2 at 1625–26)

[Trial court:]    Battery, again, the lesser as to — potentially as to Count Five. To prove the crime of battery, the State must prove the following element beyond a reasonable doubt: Tristan Hamilton intentionally touched or struck Emil Katzarski against his will.

(Doc. 14-2 at 1628)

Because the record demonstrates that the trial court correctly instructed the jury on battery, as a lesser offense of aggravated battery, the post-conviction court did not unreasonably determine that the record refutes Hamilton's claim.

When reviewing the verdict form with the jury for Count Two, the trial judge failed to state that the jury could consider battery, as a lesser included offense (Doc. 14-2 at 1643–44):

> [Trial court:]  Count Two, aggravated battery as to Mr. Koskinen. We, the jury, find as follows as to the Defendant in this case, check only one, series of boxes:
>
> A. The Defendant is guilty of aggravated battery as charged;
>
> If and only if, you find him guilty of aggravated battery, then please further find, and then it says, check one only:
>
> One. The Defendant did actually possess a firearm during the commission.
>
> Two. The Defendant did not possess a firearm during the commission.
>
> B. The Defendant is guilty of firearm as included.
>
> C. The Defendant is not guilty.
>
> And, again, a place for the foreperson to sign.

The trial judge misspoke by stating that the verdict form provided that the jury could find Hamilton "guilty of firearm as included," instead of battery, as a lesser included offense.

However, the verdict form correctly listed battery as a lesser offense for Count Two (Doc. 14-2 at 167):

Aggravated Battery — As to William Koskinen

We, the jury, find as follows, as to the defendant in this case: (check only one)

A. The defendant is guilty of Aggravated Battery, as charged.

If, and only if, you find the Defendant guilty of Aggravated Battery then please further find as follows: (check only one)

> 1. The Defendant did actually possess a firearm during the commission of the offense.

> 2. The Defendant did not actually possess a firearm during the commission of the offense.

B. The defendant is guilty of battery, as included.

C. The defendant is not guilty.

Even if trial counsel had successfully objected to the trial court's misstatement, Hamilton cannot demonstrate a reasonable probability that the outcome at trial would have changed. The jury would have received the same instructions on both aggravated battery and battery and the same jury verdict form that listed both aggravated battery and battery, as a lesser offense. Because Hamilton failed to demonstrate that, without the trial court's misstatement, the jury would have reached a different verdict, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694.

Sub-claim A is **DENIED**.

**Sub-claim B**

Hamilton asserts that trial counsel deficiently performed by not objecting to the jury instruction for principal liability. (Doc. 10 at 8) The post-conviction court denied the claim as follows (Doc. 14-3 at 37) (state court record citations omitted):

> The record conclusively refutes Defendant's claim regarding the "principals" instruction. The Court read a number of

> instructions that applied to both defendants without differentiating between them during the reading of the jury instructions. The instruction on the law of principals was one such instruction. It did not single out Defendant (or his co-defendant) by name, instead using the generic term "the defendant," whereas previously the Court had used their names. The written jury instructions, provided to the jurors, makes this clear. Because the Court committed no error, counsel had nothing to which to object.
>
> And even if the Court had only read the instruction in his case, Defendant cannot claim that the Court's failure to read a legally-required instruction in another person's case had any effect on his case where it was legally sound — and Defendant does not claim that the instruction should not have been read at all, only that it should have been read in his co-defendant's case [ ]. The claim is denied.

At the end of the instructions, the trial court charged the jury on principal liability, reasonable doubt, weighing the evidence, expert witnesses, the burden of proof, eyewitness identification, and the right not to testify. (Doc. 14-2 at 1628–35) The trial court instructed the jury on principal liability as follows (Doc. 14-2 at 1628–29):

> [Trial court:]      The law of principals. If the Defendant helped another person or persons commit or attempt to commit a crime, the Defendant is a principal and must be treated as if he had done all the things the other person or persons did if:
>
> One. The Defendant has a conscious intent the criminal act be done.
>
> And two. The Defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually commit or attempt to commit a crime. To be a principal, the Defendant does not have to be present when the crime is committed or attempted.

28

Hamilton contends that "the [prosecutor] did not charge [him] as a principal, there was no evidence that he was a principal to the crimes charged, and the [prosecutor] had not proceeded to trial on the theory that [he] was a principal." (Doc. 10 at 8) However, because, in each count the information cited Section 777.011, Florida Statutes, the statute for principal liability, the information sufficiently notified Hamilton that he faced liability as a principal. (Doc. 14-2 at 37–39) *Calloway v. State*, 37 So. 3d 891, 894 (Fla. 1st DCA 2010) ("Florida courts have consistently held that when an information cites a specific statute, the defendant is put on notice that he is charged with each of the elements of the offense contained in that statute."). *See also State v. Roby*, 246 So. 2d 566, 571 (Fla. 1971) ("Under our statute, . . . it is immaterial whether the indictment or information alleges that the defendant committed the crime or was merely aiding or abetting in its commission, so long as the proof establishes that he was guilty of one of the acts denounced by the statute.").

"'The principals instruction may be given if the evidence adduced at trial supports such an instruction.'" *Walker v. State*, 324 So. 3d 60, 62 (Fla. 1st DCA 2021) (citation omitted). As explained above in the ruling on Ground Two, the evidence proved that Hamilton and two other men entered the home with firearms and masks covering their faces. One of the perpetrators struck Koskinen and Katzarski with a firearm, while demanding the combination of a safe. The residents and guests were unable to identify who battered Koskinen and Katzarski.

Because Hamilton was liable as a principal for all crimes committed in furtherance of the common criminal scheme, an objection to the instruction on principal liability would not have succeeded, and the post-conviction court did not unreasonably deny the claim. *Bullard*, 330 So. 3d at 596. *Pinkney*, 876 F.3d at 1297 ("[A]n attorney will not be held to have

performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Sub-claim B and Ground Three are **DENIED**.

**Ground Four**

Hamilton asserts that trial counsel deficiently performed by not moving to excuse two jurors who slept during the trial. (Doc. 10 at 9–10) The post-conviction court denied the claim as follows (Doc. 14-3 at 38–40) (state court record citations omitted):

> Defendant claims that counsel rendered ineffective assistance by failing to seek removal of two jurors who he alleges slept through substantive testimony. He alleges that he saw two jurors sleeping through the testimony of Emil Katzarski and notified counsel, but that counsel failed to seek removal of the jurors or seek to determine how much testimony they missed, instead merely notifying the Court of the issue. He contends that he suffered prejudice because the jurors "would not have been able to fairly evaluate the credibility of the witness if they were sleeping during critical testimony."
>
> The record conclusively refutes this claim because counsel did point out that he thought two jurors were sleeping, identified one, but no one else saw what Defendant saw. The following exchange occurred following Mr. Katzarski's testimony:
>
> | [Trial counsel #1]: | Your Honor, [my co-counsel] noticed there were two jurors — . . . There were two jurors sleeping, noticed by [my co-counsel]. |
> |---|---|
> | [Trial judge]: | Which ones? Because — |
> | [Trial counsel #2]: | The alternate, Mr. Funaki, on the far right, first row. |
> | [Trial judge]: | Okay. I'll keep an eye on them. I've been looking over there and glancing over there. I missed that. Did you see it? |

| | |
|---|---|
| [Prosecutor]: | I didn't, no. |
| [Trial judge]: | I'll keep an eye on them. |
| [Trial counsel #1]: | Thank you. |
| [Trial judge]: | Okay. Thanks. |

Counsel brought the issue to the Court's attention and both the Court and the prosecutor noted that they did not see any jurors sleeping; the Court even noted that it had been checking.[2]

> [2] Counsel specifically identified only the alternate as having slept through any testimony, and the alternate was discharged when the jury retired to deliberate, so his missing testimony would have had no effect on the verdict.

Defendant's claim also fails because he fails to demonstrate prejudice. As an initial matter, Defendant's claim of prejudice is speculative. He alleges only that the sleeping juror "would not have been able to fairly evaluate the credibility of the witness if they were sleeping during critical testimony . . . such as," and then identifies five specific pieces of impeachment evidence. Defendant's claim does not allege as fact that the juror slept through that specific testimony, instead alleging only that he would have suffered prejudice "if" the juror slept through that testimony. That is speculation, and speculation is insufficient to form the basis for post-conviction relief. *Ellerbee v. State*, 232 So. 3d 909, 918 (Fla. 2017).

But even if Defendant had alleged as fact that the juror slept through those five pieces of evidence, his claim would fail. The Court addresses each piece of evidence in turn.

(l) That Mr. Katzarski had previously testified that he "had seen" Mr. Koskinen sell marijuana, despite testifying at trial that he did not know that Mr. Koskinen and his roommate sold marijuana. But he also testified (both on direct and in his prior testimony) that it was "none of his business," so he stayed out of it. This impeachment would have had no effect on the verdict. Mr. Katzarski's awareness of Mr. Koskinen's marijuana dealings had no effect on what occurred on the night in question. It was testimony on a collateral matter, and there is no reasonable probability that, but for one juror sleeping

through this piece of evidence, the jury would have reached a different result.

(2) That Mr. Katzarski had previously testified that he could not see the skin color of his assailants, while testifying at trial that he could tell they were African American by the skin he could see under their eyes through their masks. As Defendant writes in his motion, he "was arrested because of his tattoos" and had been "identified by the camera the victim placed in his home." The impeachment he alleges the juror missed would not have led to a different verdict by Defendant's own admission, the tattoo evidence was far more important for identification than Mr. Katzarski's testimony that his assailants were African American. Moreover, Mr. Katzarski explained that he could tell the race of his assailants by their voices as well, and Mr. Koskinen identified them as African American. Given that other testimony and the photographic evidence, there is no reasonable probability of a different result had a juror missed this piece of impeachment evidence.

(3) That Mr. Katzarski could not see his assailants' faces, because they were wearing masks. Mr. Katzarski testified to this on direct examination, and Defendant does not allege that the juror slept through that testimony. Therefore, the failure of one juror to hear this cumulative evidence did not prejudice Defendant.

(4) That Mr. Katzarski could not see his assailants' arms because they were wearing long sleeves. Defendant contends that it "would have been important for a juror to hear that the three men all had on long sleeve shirts that night." Even if that were true at some point during the attack, which it could have been, the images from the surveillance camera show the assailants' forearms clearly. A juror's consideration of this testimony would not have affected his or her consideration of the images used primarily to identify Defendant as one of the intruders, and therefore the failure of a juror to hear this testimony did not prejudice Defendant.

(5) That Mr. Katzarski could not identify his assailants. Mr. Katzarski testified to this on direct examination, and Defendant does not allege that the juror slept through that testimony. Therefore, the failure of one juror to hear this cumulative evidence did not prejudice Defendant.

> Consequently, the impeachment evidence Defendant alleges the juror missed would not have created a reasonable probability of a different result. This claim is denied.

The post-conviction court accurately quoted the transcript of the sidebar conference when trial counsel informed the trial judge about the two jurors who were sleeping. (Doc. 14-2 at 766–67) Because neither the trial judge nor the prosecutor observed a juror sleeping, a motion to excuse the two jurors would not have succeeded, and trial counsel did not deficiently perform. *Pinkney*, 876 F.3d at 1297.

Hamilton contends that trial counsel should have requested an opportunity to interview the two jurors to determine if the jurors slept during the presentation of testimony and evidence. (Doc. 10 at 10) Trial counsel identified only one juror, who served as an alternate and who was excused before deliberations. (Doc. 14-2 at 1652–53) Because Hamilton fails to present an affidavit or other evidence that demonstrates that another juror, who voted to find him guilty, slept during the presentation of testimony and evidence, Hamilton speculates that he suffered prejudice under *Strickland*. *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985) ("Speculation is insufficient to carry the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.").

 Lastly, in his post-conviction motion, Hamilton contended that he suffered prejudice because the unidentified juror slept during the cross-examination of Katzarski and therefore could not evaluate the credibility of Katzarski. (Doc. 14-3 at 14–15) He contended that the sleeping juror did not hear Katzarski admit that he could not identify the race of the perpetrators, that he did not observe the faces and arms of the perpetrators, and that he could not otherwise identify the perpetrators. (Doc. 14-3 at 15) However, the prosecutor did not prove Hamilton's identity with Katzarski's eyewitness testimony. The prosecutor

proved Hamilton's identity by matching tattoos on Hamilton's arms with tattoos on the arms of a perpetrator depicted in photographs taken by a surveillance camera during the crimes.

Also, Hamilton contended that the unidentified sleeping juror did not hear trial counsel impeach Katzarski with prior testimony to demonstrate that Katzarski knew that Koskinen sold marijuana in the home. (Doc. 14-3 at 14) However, the jury found Hamilton guilty of armed trespass and aggravated battery. (Doc. 14-2 at 166–67) At trial, the evidence proved that Hamilton and two males entered Koskinen's home with firearms and masks covering their faces, and one of the armed males intentionally struck Koskinen and Katzarski with a firearm, while demanding the combination of a safe. Evidence that Katzarski knew that Koskinen sold marijuana in the home would not exculpate Hamilton. Even if trial counsel had moved to remove the unidentified sleeping juror, Hamilton cannot demonstrate a reasonable probability that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694.

Ground Four is **DENIED**.


**Ground Five**

Hamilton asserts that trial counsel deficiently performed by not calling Shawn Johnson to testify at trial. (Doc. 10 at 11) The post-conviction court denied the claim as follows (Doc. 14-3 at 41) (state court record citations omitted):

> Defendant claims that counsel rendered ineffective assistance by failing to call witness Shawn Johnson to testify. He alleges that he informed counsel of Mr. Johnson, that Mr. Johnson was the tattoo artist who did his tattoos, and that Mr. Johnson would have corroborated Defendant's claim that he was not the person at the scene of the crime. He attaches an affidavit to his

motion from Mr. Johnson, in which Mr. Johnson avers that he was available and would have testified that he did Defendant's tattoos prior to the date the crime occurred. He contends that Mr. Johnson's testimony would have contradicted "the State's theory that Defendant had altered his tattoos in jail to avoid identification."

Defendant has failed to demonstrate a reasonable probability that, but for counsel's failure to call this witness, the jury would have reached a different result. The State presented photographs of Defendant's tattoos before and after the crime, and presented photographs of the perpetrators' tattoos. The State outlined the numerous consistencies among the "M-A-D-E" and "S-T-A-R-L-A" tattoos in those photographs, and those consistent details were visible to the jury. Particularly, photographs of Defendant's "M-A-D-E" tattoo taken prior to the crime appear identical to the same tattoo on the arm of the perpetrator in substance, style, and placement. And Dr. Norman testified that the welting around the "M-A-D-E" tattoo placed the alterations to within the time period that Defendant was in custody. Moreover, a hat with Defendant's DNA was found with shotgun shells that had been fired from Mr. Koskinen's shotgun. Given all that evidence, the testimony of a witness that the alterations were made prior to the crime would not have led to a reasonable probability of a different result.

Hamilton submitted with his post-conviction motion an affidavit by Shawn Johnson who stated that he "did tattoos [and] additional tattoos" on Hamilton's arms almost a year before the crimes (Doc. 14-3 at 29):

I was never contacted by a private investigator nor was I contacted in any way possible by Mr. Hamilton's attorney to testify as a witness on behalf of Tristan Hamilton [about] tattoos, when I was willing and available to testify. And if contacted, I would have testified that I, Shawn Johnson, did tattoos [and] additional tattoos on the arms of Tristan Hamilton in December of 2011 before his accused crime of Sept[ember] 2012.

I, Shawn Johnson, under penalty of perjury, do swear that this is my statement and general affidavit, given upon oath and affirmation of belief and personal knowledge that the following

matters, facts, and things set forth are true and correct to the best of my knowledge.

In his affidavit, Johnson did not identify the specific tattoos that he applied to Hamilton's arms before the crimes occurred. Johnson did not state that, before the crimes occurred, he specifically straightened and filled the tattoo of the letters "M-A-D-E." He did not state that, before the crimes occurred, he added the tattoos of the dollar sign and stars and of the letters "S-E-L-F." Because Johnson's vague and ambiguous sworn statement does not exculpate Hamilton, Hamilton fails to demonstrate that trial counsel deficiently performed. *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

Also, the booking photograph, taken before the crimes, of Hamilton's tattoo of the letters "M-A-D-E" and the photograph, captured by the surveillance camera during the crimes, of the tattoo of the letters "M-A-D-E" are a remarkable match. (Doc. 14-2 at 259, 261) A forensic photograph taken after Hamilton's arrest revealed additions and alterations to the tattoo of the letters "M-A-D-E." (Doc. 14-2 at 262) In the forensic infrared photograph, the dermatologist identified welting, or bruising, around the additions and alterations and explained that welting remains on the skin six to twelve months after a tattoo is applied. (Doc. 14-2 at 1321, 1325–26) The crimes occurred on September 12, 2012 (Doc. 14-2 at 669–70), police arrested Hamilton on April 17, 2013 (Doc. 14-2 at 852), and the forensic photographer photographed Hamilton's arms using infrared light on May 17, 2014. (Doc. 14-2 at 1190, 1195–97) A juror would reasonably infer from this evidence that the alterations and additions to Hamilton's tattoo of the letters "M-A-D-E" occurred after the

36

crimes and after Hamilton's arrest. Because Johnson's testimony does not rebut this reasonable inference based on expert testimony, the post-conviction court did not unreasonably deny the claim. *Johnston v. Sec'y, Fla. Dep't Corrs.*, 949 F.3d 619, 639 (11th Cir. 2020) ("There is no reasonable probability that if Busch had testified the jury would not have convicted Johnson of the murder.").

Ground Five is **DENIED**.

**Ground Six**

Hamilton asserts that trial counsel deficiently performed by not moving to sever his case from Miles's case before trial. (Doc. 10 at 13) The post-conviction court denied the claim as follows (Doc. 14-3 at 42–43) (state court record citations omitted):

> Defendant claims that counsel rendered ineffective assistance by failing to file a motion to sever his trial from that of his co-defendant, Mr. Miles. He alleges that counsel was aware of evidence admissible only against Mr. Miles — his former testimony — but prejudicial to him because it made Defendant "guilty by association" with Mr. Miles, and failed to make a motion to sever. He contends that had counsel made the motion, severance would have been granted, and there was a reasonable probability of a different result because he would not have appeared "guilty by association."
>
> Florida Rule of Criminal Procedure 3.152(b)(1)(A), provides for severance of defendants and separate trials on a showing that severance is necessary to protect a defendant's right to a speedy trial, or is appropriate to promote a fair determination of the guilt or innocence of one or more defendants. But neither "hostility among defendants," nor even "an attempt by one defendant to escape punishment by throwing the blame on a codefendant," is a sufficient reason to require severance. *Espinosa v. State*, 589 So. 2d 887, 892 (Fla. 1991), *rev'd sub nom.*, *Espinosa v. Florida*, 505 U.S. 1079 (1992) (quoting *McCray v. State*, 416 So. 2d 804, 806 (Fla. 1982)). Here, Defendant alleges only that he appeared "guilty by association," not that anything in Mr. Miles's former testimony directly incriminated him. That is insufficient to support a motion to sever, and therefore counsel was not deficient for failing to file the motion. *See Ferrell*

*v. State*, 29 So. 3d 959, 976 (Fla. 2010) (stating that counsel "cannot be deemed ineffective for failing to raise a meritless argument").

In his post-conviction motion, Hamilton alleged that the prosecutor's presentation of testimony by Miles from a prior trial directly incriminated him (Doc. 14-3 at 22) (state court record citations omitted):

> Trial counsel knew prior to the start of the Defendant's second trial that the State intended to introduce evidence that was specific to Mr. Miles, and that evidence could not be linked to the Defendant in any other way except through his co-defendant.
>
> The State argued *in limine* that it wanted to bring into trial statements that were made by Mr. Miles in their first trial. The State's objective in doing this was to link a shotgun that had been found by the police to the Defendant. The shotgun was allegedly the same shotgun reported stolen the night of the robbery in this case. The shotgun had been found at 1616 North Madison, an address that was relatively close to Mr. Miles's grandmother's home. Also, the State wanted to show that the Defendant and co-defendant were long time friends. There was no other way to prove that relationship exists between them, [and] therefore no other way to link the shotgun to the Defendant. The State sought to use Mr. Miles's testimony to [identify] the Defendant through the relationship the two of them had.
>
> Introducing Mr. Miles's prior testimony also brought to the jury's attention the fact that Mr. Miles was a nine-time felon. The jury heard he had been to boot camp as a youth, had been convicted for fleeing and eluding, robbery, aggravated assault, felon in possession of a firearm, driving [with a suspended license], possession of cocaine, and child abuse. The State was also able to elicit a lengthy detailed account of Mr. Miles's prior arrest on an outstanding warrant, in which he was charged with fleeing and eluding.
>
> The Defendant contends that he was harmed by his co-defendant's testimony because the jury could have inferred that the Defendant was guilty by association with the co-defendant. Even though Mr. Miles's defense was not hostile toward the Defendant, neither incriminated the other, and the

> State did not specifically make the argument that the Defendant
> was guilty by association with Mr. Miles, there is also nothing
> to conclusively refute the possibility that the jury utilized the
> evidence against Mr. Miles in convicting Defendant. Although,
> it did not help that the State in their closing argument pointedly
> told the jury [ ] four different times that the Defendant and Mr.
> Miles are close friends.

Hamilton asserted that prejudice directly arose from Miles's testimony about their relationship, about the Mossberg shotgun, about Miles's nine prior convictions, about the nature of those convictions, including convictions for crimes involving violent conduct, firearms, and drugs, and about Miles's attempted flight when police arrested him in this case. (Doc. 14-3 at 22) Hamilton contended that the prosecutor could not connect him to the Mossberg shotgun without Miles's prior testimony. (Doc. 14-3 at 22) The allegations in Hamilton's post-conviction motion clearly and convincingly rebut the post-conviction court's determination that Hamilton failed to allege that "anything in Mr. Miles's former testimony directly incriminated him." (Doc. 14-3 at 43) 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

Because the post-conviction court unreasonably determined the facts relevant to this claim, this Court reviews the claim *de novo*. 28 U.S.C. § 2254(d)(2). *Raleigh v. Sec'y, Fla. Dep't Corrs.*, 827 F.3d 938, 948–49 (11th Cir. 2016) ("Under § 2254(d)(2), we may grant relief only if, in light of the evidence presented in the state court proceedings, no reasonable jurist would agree with the factual determinations upon which the state court decision is based.") (citing *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015)). *Cooper v. Sec'y, Dep't Corrs.*, 646 F.3d 1328, 1353 (11th Cir. 2011) ("When a state court unreasonably determines the facts relevant

to a claim, 'we do not owe the state court's findings deference under AEDPA,' and we 'apply the pre–AEDPA *de novo* standard of review' to the habeas claim."). However, even under a less deferential *de novo* standard of review, Hamilton's ineffective assistance of counsel claim lacks merit.

Judicially noticed records from state court show that the prosecutor jointly tried Hamilton and Miles at a prior trial. Trial Transcripts, *State v. Hamilton*, No. 12-CF-17273 (Fla. 6th Jud. Cir. Sept. 4, 2015). The trial court declared a mistrial after the jury could not reach a verdict. Trial Transcripts, *Hamilton*, No. 12-CF-17273 at 1004. At the first trial, Miles testified in his own defense. Trial Transcripts, *Hamilton*, No. 12-CF-17273 at 719–92. At the second trial, the prosecutor again jointly tried Hamilton and Miles, Miles did not testify, and the prosecutor introduced into evidence Miles's testimony at the first trial. (Doc. 14-2 at 1091–1163) At the second trial, the trial court did not give a limiting instruction advising the jury that Miles's testimony at the first trial could not be used to determine the guilt or innocence of Hamilton. (Doc. 14-2 at 1090, 1163)

**Miles's Testimony at the First Trial**

The prosecutor introduced the following prior testimony by Miles. Miles testified that he regularly spent time at the home at 1616 North Madison Avenue, where police found the Mossberg shotgun, and at a home behind the home on North Madison Avenue. (Doc. 14-2 at 1092) He testified that, when police arrested him for this case, he knew that he had a warrant for violating the conditions of probation in another case where he was convicted of fleeing and eluding a law enforcement officer. (Doc. 14-2 at 1092–93) He testified that, when police arrested him in this case, he panicked and shifted his car into reverse, and undercover

officers with the "violent" task force shattered his car's window, shot him with a Taser gun, and beat him. (Doc. 14-2 at 1094–96)

Miles testified that other males who lived in his neighborhood, including his brother, had the same tattoos of the letters "B-A-B-Y" and "G-A-N-G-S-T-A." (Doc. 14-2 at 1107–08) After Miles's two brothers died during a home invasion robbery, Miles and another friend also obtained tattoos of the letters "T-H-U-G" and "A-N-G-E-L." (Doc. 14-2 at 1108–09) Miles contended that, before the crimes occurred in this case, he added a brick design and looping around the word "A-N-G-E-L." (Doc. 14-2 at 1111–14) Miles denied that he appeared in the photographs taken by the surveillance camera during the crimes, denied that he entered the home with the intent to commit a robbery, and denied that he had seen the Mossberg shotgun before trial. (Doc. 14-2 at 1115) Miles admitted that he knew a person who was shot where police found the shotgun shells fired from the Mossberg shotgun. (Doc. 14-2 at 1115)

On cross-examination, Miles testified that he knew Hamilton well, that Hamilton's mother was like his mother, that he and Hamilton lived next door to each other, were raised together, grew up together, and played sports together, and that around the time of the crimes their friendship continued. (Doc. 14-2 at 1122–24) Miles denied that he attempted to flee when police arrested him. (Doc. 14-2 at 1127, 1132–35) Miles admitted that he was a convicted felon with nine prior convictions. (Doc. 14-2 at 1100) He contended that his most serious felony conviction was for aggravated assault and admitted that he had another felony conviction for felon in possession of a firearm. (Doc. 14-2 at 1135–36) On redirect examination, Miles clarified that he served a year and a day in prison for his convictions for aggravated assault and felon in possession of a firearm, that he had other prior convictions

for driving with a suspended or revoked license, possession of cocaine, fleeing and eluding a law enforcement officer, and child abuse. (Doc. 14-2 at 1160–62)

**Relevant Proceedings**

Before jury selection at the second trial, the prosecutor moved to admit into evidence Miles's testimony from the first trial. (Doc. 14-2 at 290) Both trial counsel and counsel for Miles opposed the admission of the testimony under *Bruton v. United States*, 391 U.S. 123 (1968). (Doc. 14-2 at 290–98) Counsel for Miles argued that the relationship, coupled with Hamilton's DNA on the Miami Dolphins hat next to the shotgun shells fired from the Mossberg shotgun, prejudiced Miles. (Doc. 14-2 at 290–91, 294–95) On behalf of counsel for Hamilton, counsel for Miles further argued that the relationship, coupled with evidence that police found the Mossberg shotgun at 1616 North Madison Avenue, where Miles regularly spent time with other males in the neighborhood, prejudiced Hamilton. (Doc. 14-2 at 290–91, 294–95) Counsel for Miles argued that the admission of Miles's testimony and Hamilton's DNA on the Miami Dolphins hat required severance of the two defendants at trial. (Doc. 14-2 at 295)

"*Bruton* held that the Confrontation Clause prohibits the use of the confession of a nontestifying criminal defendant in a joint trial if the statement directly inculpates a codefendant, although it may be otherwise admissible against the confessing defendant." *United States v. Hano*, 922 F.3d 1272, 1286 (11th Cir. 2019) (citing *Bruton*, 391 U.S. at 126). Because the court found that Miles's prior testimony was not a confession that directly implicated Hamilton, the trial court granted the prosecutor's motion to admit Miles's prior testimony. (Doc. 14-2 at 630–36)

**Analysis**

Hamilton asserts that trial counsel deficiently performed by not moving for a severance based on the admission of allegedly prejudicial evidence at trial. (Doc. 10 at 13)[3] Under Florida law, "the court shall order a severance of defendants and separate trials: before trial, on a showing that the order . . . is appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Fla. R. Crim. P. 3.152(b)(1)(A). "A motion to sever should be granted when the evidence sought to be admitted applies only to a co-defendant, but which may improperly influence the jury as to the charge against the other defendant." *Miller v. State*, 756 So. 2d 1072, 1072 (Fla. 4th DCA 2000). *See also Jeffries v. State*, 776 So. 2d 335, 336 (Fla. 1st DCA 2001) (holding that, in the absence of a constitutional question under *Bruton* and the Confrontation Clause, a trial court "should grant a motion for severance whenever severance is 'appropriate to promote a fair determination of the guilt or innocence of [any] defendant[ ].'") (quoting Fla. R. Crim. P. 3.152(b)(1)(A)).

The evidence at trial proved that a group of masked armed males entered a home and one of the males struck Koskinen and Katzarski with a firearm, while demanding the combination of a safe. Miles's testimony was particularly prejudicial to Hamilton because

---

[3] Hamilton does not assert that trial counsel deficiently performed by not moving under *Bruton* to sever his trial from Miles's trial. (Doc. 10 at 13) Counsel for Miles moved under *Bruton* for a severance, and trial counsel adopted the motion on behalf of Hamilton. (Doc. 14-2 at 290–98, 630–36) Rather, Hamilton asserts that trial counsel deficiently performed by not moving for a severance based on the admission of the allegedly prejudicial prior testimony by Miles. (Doc. 10 at 13) *See, e.g.*, *Zafiro v. United States*, 506 U.S. 534, 537–39 (1993).

the jury learned that Hamilton and Miles were longtime close family friends, that Hamilton's mother was like Miles's mother, that their friendship continued at the time of the crimes, that Miles had nine prior felony convictions, including convictions for crimes involving violent conduct, firearms, and drugs, that Miles's two brothers were killed during a home invasion robbery, that Miles attempted to flee when police arrested him in this case, and that Miles knew a person who was shot at the address where police found the shotgun shells fired from the Mossberg shotgun stolen in this case. (Doc. 14-2 at 1091–1163)

If the trial court had severed Hamilton's case from Miles's case at trial, a jury would still have learned about the relationship between Hamilton and Miles and Miles's connection to the home where police found the Mossberg shotgun. *See* § 90.804(2)(a), Fla. Stat. (authorizing the admission of prior testimony by a witness who is unavailable because of a privilege). However, at a severed trial, the jury would not have learned about Miles's nine prior felony convictions, the highly prejudicial nature of those convictions, the killing of his two brothers during a home invasion robbery, his attempted flight during his arrest in this case, and his knowledge of a person who was shot where police found the shotgun shells. *See* §§ 90.401, 90.402, and 90.403, Fla. Stat. This evidence of particularly violent collateral conduct, coupled with evidence of the longstanding close family friendship between Hamilton and Miles, "may [have] improperly influenc[ed] the jury as to the charge[s] against [Hamilton]." *Miller*, 756 So. 2d at 1072.

*Hernandez v. State*, 570 So. 2d 404, 405–06 (Fla. 2d DCA 1990), reversed the defendant's convictions for cocaine trafficking and conspiracy to traffic cocaine because the trial court erred by not granting the defendant's motion to sever his trial from his co-defendant's trial:

Hernandez was tried with his brother. When his brother testified, the state cross examined the brother about the brother's involvement in other unrelated drug deals. Both defendants moved for a mistrial. The court denied the motion, finding that the brother had opened the door to these questions. The trial court limited the scope of the cross examination to showing that the brother arranged a drug deal for someone else but not that he ever bought drugs himself. Hernandez moved for a severance of his case from his brother's case. Hernandez told the court "[W]e did not put on a defense. We're getting killed by these additional collateral matters that are being allowed to come in." The defense alleged that these collateral matters were highly prejudicial and had no probative value to the crimes charged against Hernandez. The court refused to grant a severance. Hernandez again objected to the trial court allowing collateral act evidence of a prior drug transaction between the brother and a confidential informant, a transaction in which Hernandez had no involvement, and renewed his motion for a severance and for separate trials. Hernandez also objected to questions concerning possible drug use of his brother in the presence of undercover officers. A final request for severance was declined.

. . .

A motion for severance should be granted if there is evidence directed at a codefendant which is prejudicial to defendant. *Cason v. State*, 211 So. 2d 604 (Fla. 2d DCA 1968). Although here the collateral evidence was directed only at the codefendant, he and Hernandez were brothers. The brothers lived together, and the statements that the codefendant had previous dealings in drugs and used drugs certainly could have been attributed to Hernandez as a possible participant in these acts and may have contributed to the verdicts of guilty against Hernandez. It is significant that this evidence would not have been admissible in a separate trial of Hernandez even if the co-defendant had testified on the behalf of Hernandez, because the questions with respect to co-defendant's prior drug dealings would not be relevant in a trial against Hernandez for the present crimes. *See* §§ 90.401 and 90.402, Fla. Stat. (1987). As the supreme court stated in *Crum*: "The objective of fairly determining a defendant's innocence or guilt should have priority over other relevant considerations such as expense, efficiency, and convenience." 398 So. 2d at 811.

Because the admission of Miles's nine prior convictions, the nature of those convictions, the killing of his two brothers during a home invasion robbery, his flight during his arrest in this case, and his knowledge of a person who was shot where police found the shotgun shells may have improperly influenced the jury as to the charges against Hamilton, a motion under Rule 3.152(b)(1)(A), would have succeeded. *Miller*, 756 So. 2d at 1072. *Cherry v. State*, 835 So. 2d 1205, 1207 (Fla. 4th DCA 2003). *McCray v. State*, 416 So. 2d 804, 806 (Fla. 1982) ("[Rule 3.152(b)(1), Florida Rules of Criminal Procedure] allows the trial court, in its discretion, to grant severance when the jury could be confused or improperly influenced by evidence which applies to only one of several defendants.").

However, Hamilton cannot demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had filed an expanded motion to sever. *Strickland*, 466 U.S. at 694. Compelling evidence proved Hamilton's guilt. The match between the tattoo on the arm of the perpetrator captured by the surveillance camera during the crimes and the tattoo on Hamilton's arm is remarkable. (Doc. 14-2 at 258–65) A unique curved line around the letter "M" and a unique curved loop around the letter "D" in the tattoo of the letters "M-A-D-E" appear on both the tattoo captured by the surveillance camera during the crimes and the tattoo in the booking photograph taken before the crimes. (Doc. 14-2 at 259, 261) In the forensic photograph taken after Hamilton's arrest, the tattoo of the letters "M-A-D-E" appears modified; however, faint lines of the unique curved line around the letter "M" and the unique curved loop around the letter "D" still appear. (Doc. 14-2 at 262)

Because welting appears in areas where Hamilton's tattoo was modified, because the dermatologist testified that welting remains on the skin six to twelve months after a tattoo is applied, and because the forensic specialist photographed the tattoo a year after

Hamilton's arrest, the evidence convincingly proved that Hamilton modified the tattoo after the crimes occurred. (Doc. 14-2 at 263, 669–70, 852, 1190, 1195–97, 1321) Also, evidence proved that Hamilton's DNA matched a partial DNA profile on a hat next to shotgun shells fired from the shotgun stolen from the home during the crimes. (Doc. 14-2 at 682–86, 824–29, 983–86, 1033–35) This compelling physical evidence proved Hamilton's guilt. Even without the prejudicial evidence of Miles's prior testimony, Hamilton cannot demonstrate a reasonable probability that the outcome at trial would have changed. *Strickland*, 466 U.S. at 694.

Ground Six is **DENIED**.

**Ground Seven**

Hamilton asserts that trial counsel deficiently performed by not presenting testimony by an expert to rebut testimony by the dermatologist who testified for the prosecution. (Doc. 10 at 14) The Respondent asserts that the claim is procedurally barred because Hamilton failed to raise the claim in his brief on post-conviction appeal. (Doc. 14 at 30–31) In his brief on post-conviction appeal, Hamilton failed to assert that trial counsel deficiently performed by not presenting testimony by an expert. (Doc. 14-3 at 284–307) Because Hamilton failed to give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process, the claim is procedurally defaulted. *O'Sullivan*, 526 U.S. at 845.

In his reply, Hamilton contends that Rule 9.141(b)(2)(C), Florida Rules of Appellate Procedure, did not require Hamilton to raise the claim in his brief to fairly present the claim to the state appellate court. (Doc. 15 at 15–16) Because the post-conviction court summarily denied Hamilton's claims without an evidentiary hearing (Doc. 14-3 at 33–44), Rule

9.141(b)(2)(C)(i), did not require Hamilton to file a brief. However, because Hamilton opted to file a brief (Doc. 14-3 at 284–307), Hamilton had the burden to present argument in support of the issues and demonstrate reversible error. *Doe v. Baptist Primary Care, Inc.*, 177 So. 3d 669, 673 (Fla. 1st DCA 2015) ("An appellant who presents no argument as to why a trial court's ruling is incorrect on an issue has abandoned the issue.") (citations and internal quotations omitted).

"If a petitioner fails to 'properly' present his claim to the state court — by exhausting his claims and complying with the applicable state procedure — prior to bringing his federal habeas claim, then AEDPA typically bars [a federal court] from reviewing the claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). "A party does not fairly present a claim if he presents the claim in state court for the first time in a procedural context in which the merits will not ordinarily be considered." *Harris v. Sec'y, Fla. Dep't Corrs.*, 709 F. App'x 667, 668 (11th Cir. 2018)[4] (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).

Between 2000 and 2010, the Second District Court of Appeal adopted a policy that required the appellate court to review every claim in a post-conviction motion summarily denied by a post-conviction court, even if the defendant opted to file a brief on appeal and failed to raise the claim. In 2010, the court of appeal abandoned that policy. *See Cunningham v. State*, 131 So. 3d 793, 794–95 (Fla. 2d DCA 2012) ("[A]s was our standard procedure from at least December 2000 to October 2010, this court independently reviewed each and every issue that had been summarily denied. . . . In September 2010, this court, by a majority vote of its active judges, decided to align its policy with those of the other Florida district courts of

---

[4] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

appeal. Thus, we no longer determine our procedure based on how a ground in a motion is resolved."). *See also Prince v. State*, 40 So. 3d 11, 13 (Fla. 4th DCA 2010) ("In appeals from the summary denial of Rule 3.850 motions, the rules do not require briefs. When the *pro se* appellant opts to file a brief, we believe that, as in all appeals, the burden rests on the appellant to demonstrate reversible error. An appellant who presents no argument as to why a trial court's ruling is incorrect on an issue has abandoned the issue — essentially conceding that denial was correct.") (citation omitted).

Hamilton appealed the order denying post-conviction relief on July 10, 2020 (Doc. 14-3 at 280), he filed his brief on post-conviction appeal on October 14, 2020 (Doc. 14-3 at 284–307), and the Second District Court of Appeal affirmed in a decision without a written opinion on April 23, 2021. (Doc. 14-3 at 310) Even though the state appellate court affirmed without comment, this Court cannot presume that the state appellate court ignored the procedural rule adopted in 2010 and reached the merits of the claim. Because Hamilton failed to present argument on appeal in support of the claim, he failed to "fairly present" the claim to the state appellate court. If Hamilton returned to state court to raise the claim, the state court would deny the claim as successive. Fla. R. Crim. P. 3.850(h). Consequently, the claim is procedurally defaulted on federal habeas. *Harris*, 709 F. App'x at 668. *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993) ("[W]e may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of this case. In fact, the most reasonable assumption is that had the state court ruled, it would have enforced the procedural bar.").

Because Hamilton fails to allege facts that demonstrate either cause and prejudice or a miscarriage of justice based on actual innocence, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Seven is **DISMISSED** as procedurally barred.

Accordingly, Hamilton's amended petition (Doc. 10) is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Hamilton and **CLOSE** this case.

## DENIAL OF CERTIFICATE OF APPEALABILITY AND
## LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Hamilton neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on September 13, 2024.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE

50